FILED
United States Court of Appeals
Tenth Circuit

November 8, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SUSIE STROHM,

Defendant-Appellant.

No. 10-4104

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 07-CR-485-DB-2)**

---

William Michael, Jr. (Milo Steve Marsden, Dorsey & Whitney LLP, Salt Lake
City, Utah, and Laura Hammargren, Dorsey & Whitney LLP, Minneapolis,
Minnesota, with him on the briefs), Dorsey & Whitney LLP, Minneapolis,
Minnesota, for Appellant.

D. Loren Washburn, Assistant United States Attorney (Carlie Christensen, United
States Attorney, with him on the brief), Office of the United States Attorney, Salt
Lake City, Utah, for Appellee.

---

Before **BRISCOE**, Chief Circuit Judge, **TYMKOVICH**, and **GORSUCH**, Circuit
Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Susie Strohm is a former executive of ClearOne Communications, Inc. In 2003, the SEC sought a preliminary injunction against ClearOne based on suspicions of irregular accounting practices and securities law violations. During a hearing on the preliminary injunction, Strohm was asked if she was involved in a particular sale by ClearOne that was the focus of the SEC's case. She said she was not and approximated that she learned of the sale either before or after the end of ClearOne's fiscal year.

Based on this testimony, Strohm was later convicted of one count of perjury. She argues her conviction should be reversed because (1) the questioning at issue was ambiguous, (2) her testimony was literally true, and (3) even if false, her testimony was not material to the court's decision to grant the preliminary injunction.

We disagree on all three points. We find the questions were not ambiguous and there is sufficient evidence to demonstrate Strohm knowingly made false statements. Also, Strohm's testimony was material to the preliminary injunction hearing because it related to a transaction the SEC believed demonstrated ClearOne's accounting irregularities.

We have jurisdiction under 28 U.S.C. § 1291 and AFFIRM Strohm's conviction.

# I. Background[1]

Between 2001 and 2003, Strohm was an executive at ClearOne

Communications, Inc., a manufacturer of video-conferencing equipment. At

various times, she was the CFO, or the Controller and Vice President. In both

positions, she was primarily responsible for preparing ClearOne's financial

statements.

In 2001, ClearOne changed its accounting practices from a manufacturer-

based model to a distributor-based model. Using this methodology, ClearOne

recognized revenue from a distributor's order at the time ClearOne shipped the

product to the distributor, rather than the time the product was sold to an end-

user. To increase sales and meet revenue projections, ClearOne began a pattern

of shipping more product than a distributor ordered or could sell—"stuffing the

channel"—at the end of a fiscal quarter. The distributors would enter into verbal

agreements with ClearOne regarding payment for the excess product, or, as

happened here return of it. ClearOne's auditors were concerned because current

revenue from these end-of-quarter transactions may have been improperly

recognized.

---

[1] ClearOne has generated a number of federal court decisions relating to management practices recounted in part here. *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110 (10th Cir. 2010); *ClearOne Commc'ns, Inc. v. Nat'l Union Fire Ins. Co.*, 494 F.3d 1238 (10th Cir. 2007).

On June 29, 2002, one day before the end of ClearOne's 2001–2002 fiscal year, ClearOne executives, including Strohm as the company's controller, met to plan end-of-quarter shipments to distributors to ensure ClearOne met the revenue projections provided to Wall Street. Frances Flood, the CEO at the time, determined where products would be shipped and Strohm calculated how each shipment would help ClearOne reach its quarterly and yearly revenue projections.

One distributor of interest was an Australian dealer of ClearOne's products, Production Audio Services. At ClearOne's request, Production Audio had provided a blank purchase order form and expected ClearOne to ship approximately $50,000 to $100,000 of product.

In her calculations, Strohm realized she had miscalculated the projected revenue by overestimating ClearOne's margins on some products, meaning ClearOne would not make its year-end numbers. Because it was the end of the fiscal year, ClearOne had no additional product in their warehouse to ship and make up the revenue shortfall. That meant ClearOne could meet its revenue projections only by increasing the price on the already-planned shipments. Strohm determined ClearOne needed to increase either the margin or sales price to overcome the projected deficit.

To do this, Strohm unilaterally increased the sales price for the products in the Production Audio shipment, raising the price to an amount higher than Production Audio normally paid. ClearOne planned to ship over $1 million in

-4-

product to Production Audio, which expected at most $100,000. Production Audio was not consulted about the price increase or the amount of product it received. In fact, Production Audio was so surprised by the large amount, it lacked the warehouse space to receive and store the goods, and it could not afford the customs' duties on the shipment. Ultimately, Production Audio returned most of the unordered product to ClearOne.

After an insider tip, the SEC began investigating ClearOne for potential securities law violations related to improper revenue recognition. In 2003, the SEC sought a preliminary injunction against Strohm, Flood, and ClearOne to enjoin future securities law violations related to ClearOne's revenue recognition and financial statements. The SEC claimed ClearOne overstated its revenue during its fiscal year 2002 (July 2001–June 2002) by shipping more product than distributors ordered in their written sales contracts or were paying for. Because of the SEC's allegations, Strohm and Flood were replaced by an interim management team.

During the preliminary injunction hearing, Strohm testified and her counsel questioned her about the Production Audio sale in June 2002. Strohm stated she was not involved in the sale. As well, she said she did not know when she first learned of the sale but believed it was either before or after the end of ClearOne's fiscal year. This testimony is the basis for Strohm's perjury conviction on appeal here and we discuss it in more detail below. Counsel for the SEC conducted a

short cross examination of Strohm but did not question her regarding the Production Audio sale. Finding there was no reasonable or substantial likelihood of future securities law violations, the court ultimately denied the SEC's request for a preliminary injunction.

In January 2008, Strohm was charged in a second superseding indictment with two counts of securities fraud, one count of conspiracy, three counts of false statements to auditors, and two counts of perjury. Flood was also charged in the indictment on the same counts as Strohm regarding securities fraud, conspiracy, and false statements as well as three separate counts of perjury.

A jury acquitted Strohm on all counts, except the perjury count based on her testimony at the preliminary injunction hearing regarding the Production Audio sale. Also, the jury convicted Flood on all counts.[2] Strohm was sentenced to 24 months' probation and 150 hours' community service. She now appeals her perjury conviction.

## II. Discussion

Strohm was convicted of perjury for "knowingly mak[ing] any false material declaration" under oath before a court in violation of 18 U.S.C.

---

[2] On appeal, we affirmed Flood's conviction but remanded for the district court to vacate its ruling on the merits of Flood's ineffective assistance of counsel claim so Flood could assert that claim in a collateral proceeding. *United States v. Flood*, 635 F.3d 1255 (10th Cir. 2011).

§ 1623(a).[3]  To prove perjury under § 1623(a), the government must demonstrate:

> (1) the defendant made a declaration under oath before a [court];
>
> (2) such declaration was false;
>
> (3) the defendant knew the declaration was false; and
>
> (4) the false declaration was material to the [court]'s inquiry.

*United States v. Leifson*, 568 F.3d 1215, 1220 (10th Cir. 2009).  Strohm

acknowledges her testimony was under oath, but contends the government failed

to meet the remaining three elements of § 1623(a).

Strohm's perjury conviction was based on the following testimony at the

preliminary injunction hearing:

> Q  [Strohm's counsel]:  I now want to ask you some questions about the Production Audio.  You are familiar with the SEC's allegations regarding the sale of ClearOne product to Production Audio in the end of 2001, fiscal 2001?
>
> A  [Strohm]:  Fiscal 2002.
>
> Q:  I'm sorry.  2002.  You're right and I'm wrong.
>
> A:  Yes.
>
> Q:  *Were you involved in that sale*?
>
> A:  *No*.
>
> Q:  *When did it first come to your attention that ClearOne had sold product to Production Audio*?

---

[3]  18 U.S.C. § 1623, which criminalizes knowing, false declarations before a grand jury or court, is a companion to § 1621, which prohibits perjury generally.  In accord with other circuits, when reviewing convictions under § 1623(a) we have relied on cases applying § 1621.  *United States v. Farmer*, 137 F.3d 1265, 1268 n.3 (10th Cir. 1998) (collecting cases); *see also Dunn v. United States*, 442 U.S. 100, 108 (1979) (noting Congress enacted § 1623 in "response to perceived evidentiary problems in demonstrating perjury under [§ 1621]").

A:  *I don't know.*

Q:  *Can you approximate it for us?*

A:  *I don't know if it would* [sic] *been before the end of the fiscal year or after the end of the fiscal year.*

Aple. Supp. App., Vol. V at 1767 (emphasis added).

Strohm argues her perjury conviction should be reversed because (1) the question regarding her involvement with the Production Audio sale was ambiguous, (2) her testimony was literally true, and (3) her testimony was not material to the court's decision on the preliminary injunction.

We address each argument in turn, but find none persuasive.

A.  <u>Ambiguity</u>

Strohm first claims the question about her involvement in the Production Audio sale was ambiguous.  It bears emphasis, "[p]recise questioning is imperative as a predicate for the offense of perjury."  *Bronston v. United States*, 409 U.S. 352, 362 (1973).  Or, as one commentator puts it, "there are two parts of a dialogue to every perjury charge:  the question asked and the answer given.  Courts have required near-absolute clarity from the questioner in order to support a perjury charge."  Linda F. Harrison, *The Law of Lying: The Difficulty of Pursuing Perjury Under the Federal Perjury Statutes*, 35 U. TOL. L. REV. 397, 403 (2003).

The witness and examiner may have different understandings of the same ambiguous question.  An answer is not a *knowing* false statement if the witness

responds to an ambiguous question with what he or she believes to be a truthful answer. *See United States v. Hilliard*, 31 F.3d 1509, 1519 (10th Cir. 1994) ("[A] defendant's truthful answer to a reasonable interpretation of an ambiguous question does not constitute perjury."). While the premium is on clear, precise questioning, the mere existence of some ambiguity is not fatal to a perjury conviction. *See United States v. McKenna*, 327 F.3d 830, 841 (9th Cir. 2003) ("Generally speaking, the existence of some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statement prosecution."). Given the nature of language, in hindsight, many questions could be susceptible to differing interpretations. Simply plumbing a question for *post hoc* ambiguity will not defeat a perjury conviction where the evidence demonstrates the defendant understood the question in context and gave a knowingly false answer.

The case law has divided linguistic ambiguity into one of two flavors—fundamental or arguable. We consider Strohm's arguments under each approach with respect to the following question Strohm claims was ambiguous:

Q: *Were you involved in that sale?*
A: *No.*

Aple. Supp. App., Vol. V at 1767. Strohm contends the terms "involved" and "sale" injected ambiguity into this question posed by her lawyer.

## 1. *Fundamental Ambiguity*

Strohm first argues the question regarding her involvement in the Production Audio sale was fundamentally ambiguous because (1) the term "sale" has many possible definitions that incorporate different actions, and (2) the term "involved" has a broad meaning that encompasses a range of conduct. We review claims that a question is fundamentally ambiguous de novo. *United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998).

A question is fundamentally ambiguous in narrow circumstances. To qualify, the question must lack "a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Id.* (quotation omitted). That is, the question itself is excessively vague, making it impossible to know—without guessing—the meaning of the question and whether a witness intended to make a false response. *See United States v. Richardson*, 421 F.3d 17, 33 (1st Cir. 2005) ("A question that is truly ambiguous or which affirmatively misleads the testifier can never provide a basis for a finding of perjury, as it could never be said that one intended to answer such a question untruthfully.") (quotation omitted); *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) ("When a line of questioning is so vague as to be 'fundamentally ambiguous,' the answers associated with the questions posed may be insufficient as a matter of law to support the perjury conviction.").

-10-

The "rule of fundamental ambiguity" serves to:

> (1) preclude convictions grounded on surmise or conjecture;
>
> (2) prevent witnesses from unfairly bearing the risks of inadequate examination; and
>
> (3) encourage witnesses to testify (or at least not discourage them from doing so).

*Farmer*, 137 F.3d at 1269.

Courts have identified a number of factors to consider when assessing fundamental ambiguity, including:

> (1) the inherent vagueness—or, conversely, the inherent clarity—of certain words and phrases, (2) the compound character of a question, (3) the existence of defects in syntax or grammar in a question, (4) the context of the question and answer, and (5) the defendant's own responses to allegedly ambiguous questions.

Harrison, *supra*, at 404; *see, e.g., Lighte*, 782 F.2d at 375–76 (finding two questions fundamentally ambiguous "because of the imprecise use of the pronoun 'you,'" where the examiner did not distinguish between defendant's actions as a trustee and as an individual); *United States v. Manapat*, 928 F.2d 1097, 1101 (11th Cir. 1991) (finding questions regarding prior convictions on a medical certificate form ambiguous "when buried in a list headed 'Medical History'").

But "[f]undamental ambiguity is the exception, not the rule." *Farmer*, 137 F.3d at 1269; *see also United States v. Damrah*, 412 F.3d 618, 627 (6th Cir. 2005) ("It is only in exceptional cases that a question is so ambiguous, fundamentally ambiguous, such that no answer can be false as a matter of law."). Furthermore, we have conceded that "to precisely define the point at which a

-11-

question becomes fundamentally ambiguous . . . is impossible." *Farmer*, 137 F.3d at 1269; *see also Lighte*, 782 F.2d at 375 ("The phrase 'fundamentally ambiguous' has itself proven to be fundamentally ambiguous."). And a question is not fundamentally ambiguous merely because the witness and examiner could have different interpretations of it. *United States v. Camper*, 384 F.3d 1073, 1076 (9th Cir. 2004). If a witness knowingly made a false statement, based on his or her understanding of the question, it still is perjury. A witness cannot "twist the meaning of a question in his own mind into some totally unrecognizable shape and then hide behind it by alleging its fundamental ambiguity." *Richardson*, 421 F.3d at 35 (quotation omitted). Similarly, a witness cannot pluck a question from its context and then plead fundamental ambiguity by ascribing a meaning that is contrary to the question as viewed against the backdrop of the entire testimony. *Farmer*, 137 F.3d at 1269.

Before we apply this logic here, our consideration of a question's fundamental ambiguity in *Farmer* is a useful analogue. There, the following exchange was the heart of the perjury conviction:

> Q: *Have you talked to Mr. McMahon, the Defendant about your testimony here today?*
> A: *No.*

*Id.* at 1267. We found it patently unclear whether "here today" referred to either "talked" or "testimony." *Id.* at 1270. Even in context, the phrase "here today" called for an answer with two distinct temporal meanings. Because no

-12-

witness—let alone a court reviewing a cold appellate record—could know without further definition what temporal period the question referred to, there was no way to determine if the witness's answer was knowingly false. If we could not discern the correct answer to the question, we certainly could not identify a false answer.

The fundamental ambiguity we found in *Farmer* is not present here. It is true, as Strohm contends, the term "sale" has many dictionary definitions, including everything from contacting a buyer, soliciting a purchase, negotiating a contract, or executing a final agreement. *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 2003 (2002). But a mere multitude of meanings does not necessarily make for a fundamentally ambiguous question. *See Lighte*, 782 F.2d at 375 ("[B]ecause the words used in the question have different meanings in different situations does not make them fundamentally ambiguous."). Under such an interpretation, a defendant could argue almost any question was fundamentally ambiguous—even a perfectly unambiguous question where the witness and examiner shared the same understanding—by picking up a dictionary and pointing to a term with multiple definitions.

The fact that the question regarding the Production Audio sale contained words with multiple definitions did not make the question fundamentally ambiguous. The question had a simple grammatical structure and was not inherently vague, even with the terms "involved" and "sale." People in a colloquy can know the meaning of a term that might, itself, resist precise

-13-

definition. *See Wansing v. Hargett*, 341 F.3d 1207, 1214 (10th Cir. 2003) ("Some terms—like 'game' in Wittgenstein's celebrated example—carry distinct meanings to ordinary speakers of the English language even though they defy definition.") (citing LUDWIG WITTGENSTEIN, PHILOSOPHICAL INVESTIGATIONS ¶¶ 66–78 (G.E.M. Anscombe trans., 3d ed. 1958)).  As well, Strohm knew what "sale" the question referred to as she had just corrected her counsel regarding what fiscal year it occurred in.  And finally, Strohm herself set the price of the product charged to Production Audio—any meaning of "involved" would surely encompass the person who established the price of goods.

In short, whether an individual is "involved" in a "sale" is something that people of ordinary intellect could agree on.  And a witness and examiner could come to a mutual understanding of "involved in that sale" without additional definition.  Therefore, we find the question regarding Strohm's involvement in the Production Audio sale was not fundamentally ambiguous.

2. *Arguable Ambiguity*

Strohm also argues that, even if not fundamentally ambiguous, the question regarding her involvement in the Production Audio sale was arguably ambiguous because (1) she understood her connection to the Production Audio sale as one of awareness, not participation, (2) the government provided no evidence regarding what the questions meant to her, and (3) the government failed to present evidence of the preliminary injunction hearing's context.

-14-

A claim that a question was arguably ambiguous is a challenge to the sufficiency of the evidence, which we review de novo. *Farmer*, 137 F.3d at 1269. When assessing sufficiency, we view the evidence in the light most favorable to the government and consider whether a reasonable jury could have found all elements of the offense beyond a reasonable doubt. *United States v. Hooks*, 551 F.3d 1205, 1212 (10th Cir. 2009). We will reverse a conviction on sufficiency grounds only if no reasonable jury could have reached the challenged verdict. *Id.*

A question is arguably ambiguous where more than one reasonable interpretation of a question exists. But even so, a witness can still intend, and in fact give, a response that was literally false. *Richardson*, 421 F.3d at 33. The "meaning of a prosecutor's question and the truthfulness of a defendant's answer are best left to the jury." *Farmer*, 137 F.3d at 1269. To mitigate the ambiguity, the government must present evidence of the examiner's interpretation of the question as well as what the defendant understood it to mean. *See United States v. Sainz*, 772 F.2d 559, 562 (9th Cir. 1985) ("Our central task is to determine whether the jury could conclude . . . that the defendant understood the question as did the government and that, so understood, the defendant's answer was false.") (quotation omitted).

In *Farmer*, we also addressed whether the question—"Have you talked to Mr. McMahon, the Defendant about your testimony here today?"—was arguably ambiguous. 137 F.3d at 1270. We concluded the question was arguably

-15-

ambiguous because the defendant "could reasonably have believed the prosecutor to ask whether she had spoken with McMahon on the day of his pretrial hearing," rather than whether she had ever spoken with McMahon about the substance of her testimony that day. *Id.* That is, the defendant could have given a truthful answer to the question as she understood it. In subsequent testimony, the defendant admitted speaking with McMahon in the days prior, but not on the day of the hearing, which supported defendant's understanding that the question asked whether she had spoken to McMahon *on the day* of the pretrial hearing. The prosecutor did not follow up to clarify whether the defendant's answer referred to when she spoke with McMahon or whether she had discussed the substance of her testimony with McMahon. In reversing the conviction, we found the prosecutor failed "to pin her down with specific questions" and determine exactly what the defendant meant by her testimony. *Id.* The government "simply did not offer any evidence to suggest what the question meant to [the] Defendant" and that it was "[o]nly by surmise and conjecture could the jury conclude" the defendant understood the question as the prosecutor did. *Id.* Accordingly, we held there was insufficient evidence to support the defendant's conviction under § 1623(a).

As applied here, we review the sufficiency of the evidence to determine whether a rational jury could find Strohm's testimony was knowingly false.[2]

---

[2] At the outset, the government argues Strohm has failed to provide the court with a sufficient record on appeal from which we can evaluate her

(continued...)

-16-

Strohm contends a reasonable interpretation of the term "involved" refers to participation in the Production Audio sale: soliciting, negotiating, or concluding the sale. She argues her relation to the sale was one of awareness, not participation, and claims this is how she understood the question. Thus, in her understanding, because involvement required participation, and she was aware but did not participate in the sale, she was not "involved" and her testimony was not false.

We question this understanding that involvement is limited to participation. But we need not analyze the issue because, even under Strohm's interpretation that involvement denotes participation, there was sufficient evidence for a rational jury to conclude Strohm participated in the Production Audio sale.

The Production Audio sale was finalized on June 29, 2002, just one day before the end of ClearOne's fiscal year. Strohm was calculating whether ClearOne would reach its revenue projections and realized she made an error. To cover the shortfall and meet the revenue projections, ClearOne had to increase the prices on products they were shipping. Strohm did just that, and increased the price on the Production Audio sale to a level higher than it normally paid. A jury

---

[2](...continued)
sufficiency argument. The government asserts this is "virtually fatal" to her sufficiency claims and requests that we dismiss her appeal regarding those claims. *See United States v. Kimler*, 335 F.3d 1132, 1138 (10th Cir. 2003). We decline that request and note that, unlike *Kimler*, the "central part of the record" is before us for consideration. *Id.*

could reasonably conclude that, when Strohm unilaterally increased the price of the Production Audio sale, she was both "involved" and "participated" in the sale. She further claims she was not involved in the solicitation, negotiation, or conclusion of the Production Audio sale. But the fact is, no one solicited, negotiated, or concluded an agreement for the sale. The product was invoiced and shipped without consulting Production Audio.[3] We find there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Strohm knowingly made a false statement when she testified she was not involved in the Production Audio sale.

Strohm also argues the government failed to provide the proper context for her testimony at the preliminary injunction hearing. Only one page of Strohm's testimony was admitted, and she contends the government only provided conclusory testimony from an SEC attorney regarding the hearing.[4] Though the jury only received one page of her testimony, there was sufficient context to assess Strohm's testimony. The SEC attorney testified and explained to the jury

---

[3] In fact, Production Audio lacked the warehouse capacity to accept the amount of product ClearOne shipped, could not afford the import duties on the product, could not pay for the product at the new price, and eventually returned the product to ClearOne.

[4] Strohm attempted to admit her full SEC testimony under Federal Rule of Evidence 106, the rule of completeness, but the government objected. The district court ruled that it would not admit her SEC testimony wholesale, but stated it would permit the defense to admit additional pages if Strohm cited specific portions for admission. However, Strohm has not identified anywhere in the record where she attempted to admit additional portions.

why the SEC sought a preliminary injunction and its investigation into ClearOne's revenue recognition practices. Strohm's counsel's question refers to the "SEC's allegations regarding the sale of ClearOne product to Production Audio." Aple. Supp. App., Vol. V at 1767. And Strohm even corrected her counsel regarding the year of the sale, demonstrating she knew precisely what he was asking about. There was sufficient context for the jury to assess how Strohm understood the question and whether her response was truthful when she denied involvement in the Production Audio sale.

B. Literal Truth

Next, Strohm argues her testimony was literally true and cannot support her perjury conviction. She claims she gave literally true answers when she stated (1) she was not involved in the Production Audio sale, (2) she did not know when the sale came to her attention, and (3) she did not know if she became aware of the sale either before or after the end of ClearOne's fiscal year.

We have not explicitly addressed the standard of review for a literal truth claim, but we agree with other circuits that have reviewed the claim de novo as a question of law. *See United States v. Ahmed*, 472 F.3d 427, 431 (6th Cir. 2006); *United States v. Hirsch*, 360 F.3d 860, 863 (8th Cir. 2004); *United States v. Roberts*, 308 F.3d 1147, 1152 (11th Cir. 2002).

-19-

The literal truth defense originates in the Supreme Court's decision in *Bronston v. United States*, 409 U.S. 352 (1973).[5] In *Bronston*, the Court considered "whether a witness may be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication." *Id.* at 352–53.[6] The Court identified "a serious literal problem" in applying to a literally true answer the perjury statute

---

[5] The perjury conviction in *Bronston* was under the general perjury statute, 18 U.S.C. § 1621. However, we have applied *Bronston* to perjury convictions, like here, under § 1623. *See United States v. Larranaga*, 787 F.2d 489, 492 (10th Cir. 1986).

[6] The specific exchange supporting Bronston's perjury conviction was:

Q: Do you have any bank accounts in Swiss banks, Mr. Bronston?

A: No, sir.

Q: Have you ever?

A: The company had an account there for about six months, in Zurich.

Q: Have you any nominees who have bank accounts in Swiss banks?

A: No, sir.

Q: Have you ever?

A: No, sir.

*Id.* at 354. It was undisputed Bronston had a personal Swiss bank account in the past. But it was "likewise undisputed that [Bronston's] answers were literally truthful" because (1) he did not have a Swiss account at the time of questioning, (2) his company had held a Swiss account in Zurich as he described, and (3) he had no nominees who had Swiss accounts either before or during the questioning. *Id.* at 354–55. The government argued it was perjury for Bronston to mislead through the implication that, because the company had a bank account, he did not.

-20-

that made it an offense for a witness who "willfully . . . states . . . any material matter which he does not believe to be true." *Id.* at 357 (citing 18 U.S.C. § 1621). It is not perjury "for a witness to willfully state any material matter that *implies* any material matter that he does not believe to be true." *Id.* at 357–58. Worried about the chilling effect of a perjury prosecution based simply on the implication of a non-responsive, but literally true answer, the Court concluded "[a] jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner." *Id.* at 359. "[A]ny special problems arising from the literally true but unresponsive answer are to be rendered through the 'questioner's acuity' and not by a federal perjury prosecution." *Id.* at 362.[7]

We considered the literal truth defense in *United States v. Larranaga*, 787 F.2d 489 (10th Cir. 1986), where we found a defendant's conviction under § 1623(a) for false grand jury testimony was "untenable under the perjury statute as construed in *Bronston*."[8] *Id.* at 497. At issue was the defendant's grand jury

_____

[7] We recognize the testimony underlying Strohm's conviction was made in response to questions from her own counsel; she was not under cross examination. However, § 1623(a) does not distinguish between declarations made during direct versus cross examination. Nor do we think a witness's candor before the court should vary depending on whether her answers—under oath—are responses to questions from her own counsel, the government, or otherwise.

[8] While we found "fatally defective" the evidence supporting a perjury charge based on a theory of false testimony to the grand jury, we found the evidence sufficient to support the perjury conviction based on the theory of the

(continued...)

testimony regarding whether a set of a company's subpoenaed board minutes was complete.[9] The government argued the testimony was false because it implied all of the minutes had been turned over even though a second set covering the same meetings and other notes existed. We rejected this argument and concluded the questioner "could have precisely asked" whether there were other minutes detailing the same meetings or notes from those meetings. *Id.* at 497. The failure to precisely question the witness "permitted the answer to be ambiguous" and only "untrue by its 'negative implication.'" *Id.* Thus, the perjury conviction rested on "an impermissible negative implication and ambiguous circumstances." *Id.* at 497 n.2.[10]

---

[8](...continued)
submission of false documents. *Larranaga*, 787 F.2d at 495–97. Accordingly, we affirmed the conviction.

[9] Specifically, the dialogue was:

Q. Then next we subpoenaed the minutes of the Board of directors' [*sic*] meeting. We have marked as Exhibit 15. Are these all of the minutes of the Board of Directors' meeting or any other subcommittees of that board?

A. Yes, sir.

*Larranaga*, 787 F.2d at 496.

[10] Our focus in *Larranaga* was the imprecise questioning and the fact any ambiguity could have been easily remedied through follow-up questions. Arguably, the defendant's answer that "all" of the board minutes had been turned over was responsive and not undisputably true, which could distinguish *Larranaga* from *Bronston*. However, we see no disagreement between *Larranaga* and *Bronston*. Nor would any perceived difference matter because, of course, the

(continued...)

With this, we consider Strohm's claim that her answers were literally true.[11]

*Bronston* stands for the principle that a perjury conviction cannot rest on an answer that was literally true, but non-responsive and potentially misleading. *See* 409 U.S. at 358–59. By its terms, the literal truth defense is inapplicable to answers that are responsive or not undisputably true. *See Richardson*, 421 F.3d at 33 (finding *Bronston*'s "literal truth" defense inapplicable where defendant's alleged statements were false, instead of being facially true but non-responsive and misleading); *Camper*, 384 F.3d at 1076 ("*Bronston's* rule is limited to cases in which the statement is indisputably true, though misleading because it was unresponsive to the question asked.").

---

[10](...continued)
Supreme Court's decision in *Bronston* is binding upon this court. In addition, the application of *Bronston* in *Larranaga* is arguably *dicta* because our decision to affirm the perjury conviction rested on an alternate theory. *See Larranaga*, 787 F.2d at 497.

[11] Those answers were:

Q:  Were you involved in that sale?

A:  No.

Q: When did it first come to your attention that Clear One had sold product to Production Audio?

A:  I don't know.

Q:  Can you approximate it for us?

A:  I don't know if it would been [*sic*] before the end of the fiscal year or after the end of the fiscal year.

Aple. Supp. App., Vol. V at 1767.

None of Strohm's responses fall within the paradigm of *Bronston* and the literal truth defense. Each answer Strohm gave was responsive to the question asked. When asked if she was involved in the sale, she denied involvement. When asked at what point the sale came to her attention, she responded that she did not know. And when asked for an approximation of the time, she claimed not to know whether it was before or after the end of the fiscal year. Further, none of these answers is undisputably true. Her perjury conviction rests on the conclusion that her answer to the involvement question was false and there is evidence she was aware of the sale before the end of the fiscal year.

Because these answers are not literally true, we consider whether there was sufficient evidence demonstrating beyond a reasonable doubt that her answers were knowingly false. *See United States v. Thomas*, 612 F.3d 1107, 1117 (9th Cir. 2010) ("When a defendant claims that her allegedly perjured testimony was literally true based on her own purported understanding of the government's questions, the issue is whether the jury could conclude beyond a reasonable doubt that the defendant understood the question as did the government and that, so understood, the defendant's answer was false.") (quotation omitted). We have already considered Strohm's denial of involvement in the Production Audio sale, concluding there was sufficient evidence it was a knowing, false statement. Regarding her testimony approximating when she learned of the Production Audio sale, we likewise conclude there is sufficient evidence that her answer was a

knowing, false statement.[12]

On June 29, 2002, just one day before the end of the fiscal year, Strohm was reviewing the year-end shipments for ClearOne, including the Production Audio shipment, to ensure ClearOne met its revenue projections. This was the biggest sales day of ClearOne's 2002 fiscal year, representing more than 10% of that year's sales. Strohm increased the price of the Production Audio shipment just *before* the end of the fiscal year in order to ensure ClearOne would make its revenue projections. The magnitude of the Production Audio sale, combined with Strohm's active participation in determining the amount and price of product shipped that day, supports the reasonable inference that she knew she learned of the transaction prior to end of ClearOne's fiscal year. In addition, her testimony at the preliminary injunction hearing demonstrates she recalled the Production Audio sale. She admitted familiarity with the sale to her counsel, even correcting her counsel as to the fiscal year involved. Also, the SEC hearing occurred only nine months after the end of the fiscal year.

---

[12] In their briefs, the parties discuss Strohm's first "I don't know" response only in passing. As we explain here, the evidence was more than adequate to prove that Strohm did know that she had learned of the sale before the end of the fiscal year. We are not convinced, however, that sufficient evidence was presented to show that she knew *exactly* when it first came to her attention. Thus, her first disavowal of knowledge, without more, might not have been enough to support her conviction. We need not decide this issue, however, because Strohm's other two statements provide adequate grounds for us to affirm the jury's verdict. *See Griffin v. United States*, 502 U.S. 46, 49 (1991) ("[A] general jury verdict [i]s valid so long as it [i]s legally supportable on one of the submitted grounds . . . .").

Based on this evidence, a rational jury could conclude Strohm knowingly gave false testimony when she claimed she learned of the Production Audio sale either before or after the end of the fiscal year, because she clearly learned about the sale before the end of the fiscal year.

C. Materiality

Finally, Strohm argues the government failed to prove her testimony was material to the district court's decision to grant the SEC's preliminary injunction. We conclude, however, there was sufficient evidence for a jury to find her testimony regarding past accounting irregularities was capable of affecting the court's calculus of whether an injunction was necessary to inhibit future corporate malfeasance by Strohm and other ClearOne officers.

As an initial matter, the parties disagree over the applicable standard of review regarding a statement's materiality. Strohm contends materiality is a question of law we should review de novo. But the Supreme Court has recognized that a statement's materiality is "commonly called a 'mixed question of law and fact,' [that] has typically been resolved by juries." *United States v. Gaudin*, 515 U.S. 506, 512 (1995); *see also Johnson v. United States*, 520 U.S. 461, 465 (1997) ("*Gaudin* therefore dictates that materiality [under § 1623] be decided by the jury, not the court."). And we have held that "[m]ateriality is an element of the crime of perjury, which must be submitted to the jury and proven by the prosecution beyond a reasonable doubt." *United States v. Hasan*, 609 F.3d

1121, 1137 (10th Cir. 2010) (quotation omitted).  Thus we review the sufficiency of the evidence to determine whether "a reasonable jury could conclude that [defendant's statements] were material."  *Id.* at 1140.

Under § 1623(a), the government must prove a false statement was material to the decision-making body's inquiry.  *United States v. Clifton*, 406 F.3d 1173, 1177 (10th Cir. 2005).  False statements are material if they have "a natural tendency to influence, or be capable of influencing, the decision required to be made."  *Leifson*, 568 F.3d at 1220 (quotation omitted).  "The testimony need not have an actual effect; it merely must be capable of influencing the [decision-making body]."  *United States v. Vap*, 852 F.2d 1249, 1253 (10th Cir. 1988) (quotation omitted).  Here, we must consider whether Strohm's false statements had a tendency to influence, or were capable of influencing, the district court's decision to grant a preliminary injunction.

Strohm argues her testimony regarding the Production Audio sale was immaterial to the issues before the court during the preliminary injunction hearing.  She claims her testimony had no bearing on the court's decision because it was focused on the narrow task of whether to enjoin future violations by ClearOne.  Strohm asserts this issue was unrelated to the Production Audio sale because she had been suspended from the company at the time of the hearing.  Strohm also notes the government did not offer evidence of the SEC's complaint or the court's order denying the injunction and contends there was insufficient

evidence to place her statements in the proper context of the injunction hearing to determine their materiality.

We disagree. A reasonable jury could conclude Strohm's false statements were capable of influencing the court's decision of whether to enjoin potential future violations of the securities laws. The government presented sufficient evidence that Strohm's testimony was material to this point.

For example, the jury heard testimony from the SEC attorney, Thomas Melton, who sought the injunction against ClearOne. Melton explained to the jury that the injunction was meant to stop future securities law violations. He stated the SEC was focused on ClearOne's accounting policies related to a number of transactions where the sale was improperly recognized as revenue. The Production Audio sale was one such transaction the SEC believed demonstrated ClearOne's improper revenue recognition. And Melton testified it was important to determine Strohm's level of knowledge and participation in the Production Audio sale as it was relevant to the SEC's case. Testimony from individuals present at a proceeding is a proper method to show materiality. *See Hasan*, 609 F.3d at 1138 ("[T]he government may prove materiality . . . by presenting testimony from persons who witnessed the proceedings.") (quotation omitted).[13]

_____

[13] The government could have provided more evidence to the jury regarding the SEC's case, including the SEC's complaint and the court's decision

(continued...)

In addition, the government presented evidence from an auditor of ClearOne's financials regarding the proper accounting factors a corporation must consider when recognizing revenue in its financial statements. The auditor testified she had instructed Strohm on the requirements for revenue recognition. From this testimony, the jury could reasonably conclude the Production Audio sale failed to meet the requirements for revenue recognition because Production Audio did not order the product, did not agree to Strohm's increase in price, and could not afford to pay for it. That is, the jury could conclude ClearOne improperly recognized the revenue from the Production Audio sale.

With this evidence, the jury could have reasonably concluded Strohm's testimony regarding the Production Audio sale—at the center of alleged improper accounting practices—was material to the court's decision on the preliminary injunction. Strohm falsely testified that she was not involved in the Production Audio sale and learned of the sale either before or after the end of the fiscal year. It is reasonable for a jury to conclude Strohm's testimony denying her past involvement in the Production Audio sale—an example of ClearOne's alleged fraudulent accounting practices—was material to the court's determination of how widespread the problems were at ClearOne and the scope of the involvement by

_____

[13](...continued)
denying the preliminary injunction. The government conceded as much. But the government presented testimony from the SEC attorney who sought the injunction covering much of this information, which is sufficient in these circumstances.

senior company executives. Also, it was reasonable to conclude Strohm's statement that she learned of the Production Audio sale either before or after the end of fiscal year was material. Because if she testified she had learned of the sale before the end of the fiscal year, she either was a part of the decision to improperly recognize the revenue or at least did nothing to stop the improper accounting. But her false testimony undercut any such inference.

Central to the decision to grant injunctive relief was whether ClearOne's improper revenue recognition, as exemplified in the Production Audio sale, was likely to continue and whether a preliminary injunction was necessary to stop future transgressions. Strohm's testimony regarding her participation in sales that were improperly recognized, and her knowledge that improper revenue recognition was occurring, was capable of influencing the court's decision of how far the alleged malfeasance had spread through ClearOne and whether it was likely to occur in the future.

Therefore, we conclude the evidence sufficiently established the materiality of Strohm's testimony to the court's decision on whether to issue a preliminary injunction.

### III. Conclusion

For the foregoing reasons we AFFIRM Strohm's conviction.