**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-5037**

_____

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

     v.

JOHN ROBERT GRAVES,

             Defendant - Appellant.

_____

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.  James R. Spencer, Senior
District Judge.  (3:11-cr-00246-JRS-1)

_____

Argued:  October 30, 2014              Decided:  November 21, 2014

_____

Before WILKINSON, MOTZ, and FLOYD, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Patrick L. Bryant, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Alexandria, Virginia, for Appellant.  Kevin Brian
Muhlendorf, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellee.  **ON BRIEF:** Michael S. Nachmanoff, Federal
Public Defender, Alexandria, Virginia, Carolyn V. Grady,
Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Richmond, Virginia, for Appellant.  Jeffrey H. Knox,
Chief, Criminal Division, Fraud Section, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C.; Neil H. MacBride,
United States Attorney, Alexandria, Virginia, Jamie L.
Mickelson, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Atlanta, Georgia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

John Robert Graves and his wife engaged in an elaborate scheme to swindle at least eleven clients out of approximately $1.3 million. On appeal, he challenges his convictions for making a false statement in the course of a government investigation and committing fraud while serving as an investment adviser, as well as a two-level sentencing enhancement applied for conducting fraud through sophisticated means. We find no merit in his contentions, and hereby affirm.

## I.

After resigning from the FBI, Graves registered as an investment adviser and broker to offer tax advice and estate planning services through his company, Brook Point Management, Inc. ("BPM"). He was also employed by, and served for a time as president of, an Indiana-based investment company called Compass Financial Advisors ("Compass"). His wife, Sara Graves, served as the managing member of another company, Dupont Auburn Real Estate ("DARE"), which was created to facilitate the purchase of an office building in Indiana in which Compass could rent office space. In time, the couple used these three entities, along with several personal accounts, to further their fraudulent transactions.

Graves's victims were generally elderly or inexperienced investors seeking a safe haven for large sums of money they had

acquired, often through inheritance or insurance payments. Graves would pitch investments in BPM or DARE to them, while neglecting to mention that DARE was nominally owned by his wife. For example, Graves became Janice Robinson's investment adviser for funds she inherited from her late husband. He advised her to invest $200,000 in BPM and DARE, which she did. She later gave Graves another $23,000 to hold in escrow, which he and his wife instead put into the DARE account to use for other purposes. Of the $223,000 she invested, Robinson was only able to recover $9,000.

In 2008, Barbara Wren sent Graves $150,000 to invest from money inherited from her mother. Graves used the funds to purchase and offer for rent a house in Partlow, Virginia -- where Wren herself lived. When Wren raised questions in 2009 about the lack of paperwork, he offered her $150,000 in AIC stock -- another company associated with the defendant -- which turned out to be virtually worthless.

Around the same time, Christine Taugher and her two sons contacted Graves to invest money they had obtained from retirement savings and life insurance funds after Taugher's husband passed away. Graves recommended investing in real estate as a safe investment with reasonable returns and eventually received $578,000 from the family to invest in DARE. He neglected to mention his connection to DARE, and the family

4

never recovered its investment. Other victims recounted similar experiences, also resulting in a complete loss of their savings.

In the fall of 2008, Graves and his business partner, John Lauer, arranged to acquire a controlling ownership interest in Compass by making several significant payments in 2009 and 2010. Several of these payments, including one for $200,000 due June 30, 2009, were personally guaranteed by Graves and his partner. Failing to pay on time would cost both of them their shares in the company and any investment made to date. Graves used his fraudulent transactions to pay off these debt obligations, as well as to fund other personal expenses for himself and his wife.

FBI Special Agent Tyler Kennedy, who investigated the Graveses' scheme, traced the Taughers' money through the defendants' various accounts. Graves received Christine Taugher's money June 29, 2009, the day before the $200,000 payment was due for Compass. After only a few days in the DARE account, Taugher's money was transferred to a joint personal savings account on July 1, 2009. That day, Sara Graves closed the joint account and opened a new account in her name only with Taugher's funds. The money was disbursed from there to pay various personal debts, including the funds owed to Compass. Taugher's sons' investment was likewise only in the DARE account a few weeks before being moved to other accounts. A portion of

it was used to fund the purchase of the AIC stock given to Wren for her investment. However, when Graves was specifically asked about the repayment to Wren during the investigation, he represented that she had been paid using money his wife had inherited from her mother.

On October 4, 2011, the Graveses were indicted for conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, mail fraud in violation of 18 U.S.C. § 1341, and four counts of wire fraud in violation of 18 U.S.C. § 1343. In addition, John Graves was indicted for three counts of fraud in violation of the Investment Advisers Act, 15 U.S.C. §§ 80b-6 and 80b-17, and one count of making false statements in a "matter within the jurisdiction of the executive . . . branch of the Government" in violation of 18 U.S.C. § 1001. After a four-day jury trial, the Graveses were convicted on all counts. John Graves was sentenced to 135 months of imprisonment and three years of supervised release, and was ordered to pay nearly $1.3 million in restitution. The 135 months of imprisonment was the minimum amount of time recommended by the Sentencing Guidelines range, which included a two-level enhancement for sophisticated means.

On appeal, Graves challenges the sufficiency of the evidence supporting the false statement conviction. He claims that the FBI agent's question was ambiguous and that his answer

was also ambiguous and in fact true, and therefore could not constitute a false statement. He also challenges the sufficiency of the evidence for the Investment Advisers Act conviction by arguing that the government failed to prove that he was serving as an investment adviser rather than a broker-dealer -- which is an exception under the Act -- when he committed the fraud. Finally, he challenges the two-level sentencing enhancement for sophisticated means. Because we find that there was more than sufficient evidence to support the convictions and sentencing enhancement, we affirm.

## II.

Graves first contends that there was insufficient evidence to support the false statement conviction. A jury verdict must be upheld on appeal if a reasonable factfinder could "accept [the evidence] as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). The evidence must be viewed in the light most favorable to the government and "in cumulative context" rather than piecemeal. Id. at 862-63.

Graves claims the government failed to introduce sufficient evidence to prove that he knowingly made a "materially false, fictitious, or fraudulent statement or representation" in a matter within the jurisdiction of the federal government. 18

7

U.S.C. § 1001(a). He singles out the following exchange as the "false statement" he is alleged to have made:

> Agent Kennedy: And that's where the $150,000
>
> went, came from to go to Barbara Wren?
>
> Graves: I guess.

J.A. 924. Graves argues that both the question and answer were ambiguous and that, in part owing to the ambiguity, the answer was factually correct. Though literal truth and ambiguity are both defenses to false statement claims, see United States v. Good, 326 F.3d 589, 592 (4th Cir. 2003); cf. Bronston v. United States, 409 U.S. 352, 360-62 (1973) (overturning perjury conviction), these exceptions are narrow, and must account for the context of the statement and the intention of the witness. United States v. Sarwari, 669 F.3d 401, 406 (4th Cir. 2012); see also United States v. Strohm, 671 F.3d 1173, 1179-80 (10th Cir. 2011).

Graves distorts the issue here by extracting the slightest snippet of the exchange between himself and Agent Kennedy. The brief exchange cited by Graves followed a more extensive discussion that began with questions about where the defendant had obtained the money to repay Wren. In response to questions about the $150,000, Graves stated falsely that Sara Graves paid the $150,000 to Wren out of the $714,000 Sara received from her mother's estate. Discussions about the inheritance followed and

eventually resulted in the tidbit quoted by the defendant. Graves had recorded this entire exchange, unbeknownst to Agent Kennedy, and the recording was played at trial for the jury. The jury thus had the opportunity to gauge for itself, in the context of the full conversation, whether Graves had made a false statement in the course of a government investigation. It determined beyond a reasonable doubt that he had.

The jury had the chance to observe firsthand and weigh in its totality all witness testimony and other evidence. We will not disturb its verdict when, taken in context, the evidence reasonably supports the conclusion that Graves falsely stated and intentionally concealed the origins of the funds given to Wren. As that was clearly the case here, we affirm the false statement conviction.

## III.

Graves also contends that his convictions on Counts Seven, Eight, and Nine, charging violations of the criminal fraud provisions of the Investment Advisers Act, were not supported by sufficient evidence and must therefore be overturned. The Investment Advisers Act prohibits investment advisers, as defined by the Act, from defrauding their clients and prospective clients. See 15 U.S.C. § 80b-6. Graves argues that the government failed to prove that he was in fact acting as an

9

investment adviser rather than a broker-dealer when he committed the fraudulent acts.

Graves's contention fails for several reasons. First, he stipulated at trial that "for purposes of 15 U.S.C. Sections 80(b)(6) and 80(b)(17), Section 206 of the Investment Advisers Act, John Robert Graves was an Investment Adviser from 2006 to 2010." J.A. 144. The broker-dealer exception is contained within the definition of an "investment adviser" and prevents brokers and dealers from being drawn into the Act's prohibitions by their incidental investment advising activities; the exception cannot rescue someone who has already stipulated that he meets the Act's definition of an investment adviser. See 15 U.S.C. § 80b-2(11). Furthermore, he did not, and indeed could not because of the stipulation, object to the proof of that element of the crime at trial, raising the whole matter for the first time on appeal. Finally, as a practical matter, Graves was registered as an investment adviser during the relevant time period, and providing investment advice for a fee to his victims to prompt them to invest in his and his wife's companies was essential to his fraudulent scheme. For the foregoing reasons, we affirm the conviction.

IV.

Finally, Graves disputes the two-level sophisticated means enhancement applied to his advisory Sentencing Guidelines

10

calculation. Whether a defendant used sophisticated means is a finding of fact that we review for clear error. United States v. Adepoju, 756 F.3d 250, 256 (4th Cir. 2014).

Defendants are subject to a two-level enhancement under the Sentencing Guidelines if they perpetrate their fraudulent schemes using "sophisticated means." U.S.S.G. § 2B1.1(b)(10). The Guidelines describe this term as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B). Though the Guidelines identify conduct that would merit the enhancement, these examples are merely illustrative. Any given element of the scheme need not itself be particularly complex or intricate; rather, the scheme should be viewed as a whole. See United States v. Jinwright, 683 F.3d 471, 486 (4th Cir. 2012).

The district court had ample basis for its finding that the Graveses' scheme was sophisticated. Graves and his wife transferred the funds multiple times through multiple accounts, in one case channeling Taugher's money through four accounts in a matter of days. J.A. 662-66. Defendants did not merely move money from one account to another; they engaged in a veritable shell game, switching money here and there between personal and business accounts, to conceal the source of the funds and hide their fraud. The district court did not clearly err in applying the two-level sophisticated means enhancement.

11

The judgment is in all respects affirmed.

<u>AFFIRMED</u>