**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 3, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SIDNEY BROOK MAYFIELD,

    Defendant - Appellant.

No. 25-5013
(D.C. No. 4:24-CR-00051-SEH-2)
(N.D. Okla.)

_____

## ORDER AND JUDGMENT*
_____

Before **MATHESON**, **MURPHY**, and **FEDERICO**, Circuit Judges.
_____

This case began when Sidney Mayfield drove her son and others to a gas station in Tulsa. But what may have been intended as a routine trip ended with Mayfield's son shooting a man and Mayfield herself later being convicted of multiple felonies for attempting to obstruct the ensuing criminal proceedings.

Mayfield now appeals her convictions, arguing that prosecutors presented insufficient evidence of perjury and unconstitutionally used her

---

\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

invocation of the right to remain silent against her. Applying our deferential standard for reviewing jury verdicts, we conclude that the jury heard enough evidence to sustain Mayfield's perjury conviction. And applying plain error review, we find that Mayfield failed to establish the prejudice necessary for her to prevail on her constitutional argument. We therefore exercise our jurisdiction under 28 U.S.C. § 1291 to affirm.

## I

### A

On a late November night in 2023, Mayfield drove to a Tulsa gas station with her son, Marco Atkins, and several others.[1] They were not there for long – less than five minutes – but those scant minutes proved to be troublesome and eventful. When Mayfield arrived, all was peaceful; when she left, a man named Terry Brown laid on the ground, bleeding from multiple gunshot wounds. Security camera footage captured the entire affair.

The footage shows that Mayfield pulled into the gas station in a large black SUV. After parking in front of the convenience store, Mayfield entered the store with the rest of her group. They stayed inside for about a minute

---

[1] Because a jury convicted Mayfield, "we draw the facts from the evidence presented at trial in the light most favorable to the government." *United States v. Schulte*, 741 F.3d 1141, 1144 (10th Cir. 2014).

before returning to the SUV. A few seconds later, Brown exited and stood on the sidewalk in front of the SUV.

It's not completely clear how Brown became entangled with Mayfield's group from that point forward, but the way things ended was unmistakable. Shortly after Brown stepped outside, two members of Mayfield's group got out of the SUV to re-enter the store, brushing by Brown along the way. Brown followed them inside where the three of them appeared to exchange words. When those two members of Mayfield's group returned to the SUV, Brown again followed them outside and began walking past the SUV, apparently on his way to the gas pumps. But when he reached the SUV's back wheel, he paused and turned to face the SUV. At that moment, an arm extended out of the passenger door holding a gun. Shots were fired. Brown collapsed. And Mayfield sped away.

**B**

Several days later, a Tulsa police officer visited the gas station to view the security footage. After viewing the footage, he noticed Mayfield working there. So, he asked to speak with Mayfield and gave her a *Miranda* warning. At first, Mayfield told the officer that she wanted to exercise her right to remain silent. However, Mayfield quickly changed her mind. Mayfield started talking and told the officer that a woman named Le'Kysha Davis,

3

who was part of Mayfield's group on the night of the shooting, had fired the shots that hit Brown.

About two months after Mayfield spoke with that officer, on January 25, 2024, prosecutors filed a criminal complaint against Mayfield's son, Atkins. The complaint charged Atkins with assault for shooting Brown, who had survived the shooting. Prosecutors then subpoenaed Mayfield and other witnesses to testify before a grand jury two weeks later.

Mayfield accepted the subpoena and appeared to testify. As relevant to this appeal, Mayfield told the grand jury that she was sitting in the driver's seat of her SUV when shots were fired. Mayfield explained that she heard the shots come from the SUV's passenger seat on her right. But Mayfield claimed on multiple occasions that she did not know who fired those shots. According to her, both Atkins and Davis were in the passenger area, and she wasn't looking in that direction. For that reason, when a prosecutor asked her point blank, "Did you see Marco Atkins shoot Terry Brown," Mayfield responded, "No, I did not." Supp. R. at 26.

According to prosecutors, Mayfield's answer was a brazen lie meant to shield Atkins from justice. But that was just the start. In addition to allegedly deceiving the grand jury, Mayfield made plans to scare witnesses away from testifying, such as by exposing potential witnesses' cooperation to local gangs. Mayfield revealed these plans on recorded jail calls with

Atkins. She also followed through publicly, posting a video on Facebook Live that threatened one witness as a "snitch" and a "rat."

In response, prosecutors obtained an indictment against Mayfield on five charges related to witness tampering and obstruction: one count for conspiracy to tamper with witnesses, 18 U.S.C. §§ 1512(k), 1512(b)(1), 1512(b)(2); one count of substantive witness tampering, 18 U.S.C. § 1512(b)(2); one count of retaliating against a witness for cooperating with an investigation, 18 U.S.C. § 1513(b)(2); one count of obstruction of justice, 18 U.S.C. §§ 1503(a), 1503(b)(3); and one count of grand jury perjury, 18 U.S.C. § 1623(a).

## C

Mayfield proceeded to a joint trial with Atkins. During the trial, Atkins chose to testify and admitted to shooting Brown. Mayfield did not testify at trial; instead, prosecutors introduced her prior statements against her. For example, prosecutors introduced the full written transcript of Mayfield's grand jury testimony. They also elicited testimony from the Tulsa police officer to whom Mayfield had spoken, and the officer briefly referred to Mayfield invoking her right to remain silent.

After receiving this evidence and more, the jury heard closing arguments. In those arguments, prosecutors did not address Mayfield invoking her rights. Rather, they hammered home their theory of case:

Mayfield wanted to keep her son out of jail. So, according to prosecutors, she lied to the grand jury that she did not see Atkins fire any shots, and she obstructed justice by threatening witnesses who may testify against him.

At the end of it all, the jury convicted Mayfield on all counts, and the district court sentenced Mayfield to a total term of 70 months' imprisonment. Mayfield timely appealed.

## II

Mayfield raises two arguments on appeal. She claims that prosecutors did not present sufficient evidence to support her perjury conviction. She also claims that prosecutors violated her Constitutional rights when they used against her that she initially invoked her right to remain silent when questioned by a Tulsa police officer. We take each argument in turn.

## A

The Government bears the burden of proving every element of a charged offense beyond a reasonable doubt. *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). Once the jury returns a guilty verdict – signaling that the jury believes the Government has met its burden – appellate courts reviewing the verdict grant significant deference to the jury. *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015). Under that deferential standard, we cannot reverse a conviction for insufficient evidence unless the defendant convinces us that "no rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *United States v. Hale*, 762 F.3d 1214, 1222–23 (10th Cir. 2014)). The defendant must convince us of this without reweighing the evidence or challenging credibility. *United States v. Christy*, 916 F.3d 814, 843 (10th Cir. 2019). And she must do so even as we are required to view all evidence, and draw all inferences, in the manner most favorable to the guilty verdict. *Id.*

The charge at issue here is perjury, which requires the Government to prove four elements: (1) the defendant made a statement under oath; (2) the statement was false; (3) the defendant knew the statement was false; and (4) the statement was material. *United States v. Hasan*, 609 F.3d 1121, 1134 (10th Cir. 2010). Mayfield challenges the sufficiency of the Government's evidence on just two of these elements, falsity and materiality.

Before addressing those two elements, however, we start with a threshold question: What are the false statements for which Mayfield was convicted? The indictment does not identify specific statements. Nor does the Government's brief, which instead opts for strategic ambiguity by asserting that a "rational jury could have found that at least one of Mayfield's statements to the grand jury was false." Resp. Br. at 38. The Government's position was much the same when we probed this issue at

oral argument. In fact, the Government seemed to go even further. It suggested that we could affirm based on any statement whatsoever, even if prosecutors never argued that statement to the jury, so long as sufficient evidence was presented at trial to support a conviction on that statement.

We doubt that proposition. True enough, we must affirm if there is sufficient evidence to convict on one statement but not others. *United States v. Strohm*, 671 F.3d 1173, 1185 n.14 (10th Cir. 2011). But it does not follow that we have free rein to pick through the entire record in search of a ground for affirmance on a theory that prosecutors never presented to a jury. To the contrary, the Supreme Court has told us that we "are not permitted to affirm convictions on any theory [we] please simply because the facts necessary to support the theory were presented to the jury." *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991).

For our purposes in this case, though, we need not and do not pass upon how *McCormick* may limit our authority to review perjury convictions for sufficiency. That is because we find that there was sufficient evidence to convict on one of the statements that prosecutors did expressly argue to the jury. Namely, prosecutors argued in closing arguments that Mayfield committed perjury when she told the grand jury that she did not see Atkins fire any shots. Prosecutors presented sufficient evidence that this statement was both material and false.

8

Materiality is easy. A statement is material if it has a "natural tendency to influence, or [is] capable of influencing, the decision required to be made." *United States v. Leifson*, 568 F.3d 1215, 1220 (10th Cir. 2009) (quoting *United States v. Durham*, 139 F.3d 1325, 1329 (10th Cir. 1998)). The decision before the grand jury was whether to indict Atkins for assault based on the shooting of Brown. That decision obviously required the grand jury to decide whether Atkins shot Brown in the first place. A statement like Mayfield's – that she did not see Atkins fire any shots at all – goes to the heart of that decision.

Mayfield counters that her statement was not material because the grand jury was operating under the probable cause standard, not the higher beyond a reasonable doubt standard. But the ultimate burden of proof is beside the point. Materiality turns on *tendency* to influence and does not require proof that a statement *actually* influenced a decision. *United States v. Williams*, 934 F.3d 1122, 1129 (10th Cir. 2019).

Mayfield also suggests that her statement was not material because elsewhere in her grand jury testimony, she admitted that the shots had to have come from either Atkins or Davis. That other testimony, she says, supplied probable cause to indict Atkins. Maybe so. But Mayfield overlooks the fact that, had she testified to seeing Atkins fire the shots instead of denying that she had seen anything, the grand jury would have had greater

9

cause to indict. Certainly, that additional evidence would have influenced the grand jury's decision. We therefore conclude that the Government presented sufficient evidence of materiality.

Falsity is somewhat more challenging. To support perjury, a statement must be more than "arguably misleading by negative implication." *Strohm*, 671 F.3d at 1183 (quoting *Bronston v. United States*, 409 U.S. 352, 352–53 (1973)). If a statement is literally true, it is not perjurious even if it "*implies* [some] material matter that [the speaker] does not believe to be true." *Id.* at 1184 (quoting *Bronston*, 409 U.S. at 357–58). Mayfield invokes this literal truth defense.

The thrust of Mayfield's argument is that she was not looking at Atkins when shots were fired, so she literally did not see Atkins firing the shots. And to be sure, there was no direct evidence that Mayfield was watching Atkins. The surveillance video that exists is too low in resolution for anyone to see which direction Mayfield was looking in when Atkins opened fire.

That said, the circumstantial evidence is fatal to Mayfield's position. As Mayfield admitted, at the time of the shooting she was in the driver's seat of her SUV, and Atkins was in the passenger seat next to her. She also claimed to be looking directly at Brown when he was shot. Since Brown was standing by the rear wheel on the passenger side of the SUV, that means

Mayfield was facing in Atkins's direction. As the diagram below illustrates, a rational jury could infer from these facts, beyond a reasonable doubt, that Atkins was within Mayfield's line of sight when he pulled the trigger. That would make Mayfield's statement literally false, supplying sufficient evidence to support falsity.



Resp. Br. at 12.[2]

Accordingly, we conclude that there was sufficient evidence to convict Mayfield of perjury.

---

[2] This diagram was presented as a demonstrative exhibit in the Government's appellate brief, not as evidence at trial. We include it here for demonstrative purposes only. To avoid confusion, we have also removed the labels for the other individuals in the SUV.

**B**

With that, we turn to Mayfield's constitutional argument. In *Doyle v. Ohio*, the Supreme Court held that it violates due process to use a defendant's invocation of the right to silence against her at trial. 426 U.S. 610, 618 (1976); *see also United States v. Oliver*, 278 F.3d 1035, 1039 (10th Cir. 2001). Mayfield asserts that the Government crossed this line when one of its witnesses – the Tulsa police officer with whom she had spoken – told the jury that she had invoked her rights.

Mayfield concedes, though, that she did not object to this testimony during trial. Thus, we review for plain error. *United States v. LaVallee*, 439 F.3d 670, 684 (10th Cir. 2006). Under plain error review, we reverse only if (1) there was error that (2) was plain, and that error (3) caused prejudice and (4) affected the fairness and integrity of judicial proceedings. *Christy*, 916 F.3d at 843. We may affirm, however, on any one prong. *See United States v. Lacy*, 904 F.3d 889, 894–95 (10th Cir. 2018) (affirming based solely on the third prong). We affirm here on the third prong.

As the appellant, Mayfield bears the burden of proving prejudice under the third prong. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005). Mayfield must convince us there is "a reasonable probability that, but for the error claimed, the result of the proceeding

12

would have been different." *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004)). She has not carried that burden.

Assuming without deciding that the Government committed a plain *Doyle* error, we find that Mayfield nonetheless suffered no prejudice because that error was a little more than a blip in the context of the entire trial. Here is the entirety of the challenged testimony:

> Q. Did you interview Sidney Mayfield?
>
> A. Yes, I did. Asked her to step outside and speak with me. She did. We went to my patrol vehicle, and I read her her *Miranda* rights.
>
> * * *
>
> Q. What did Ms. Mayfield say during that interview?
>
> A. When I read her the *Miranda* rights, she stated that she did not want to speak with me, and I ended the interview at that point. I exited my vehicle, and left her sitting in the front passenger's seat of my vehicle.
>
> Q. And did you – did she later change her mind, agree to talk [to you]?
>
> A. Yes. Uh, while other officers in my unit were searching [her] vehicle, uh, she stated she did want to speak with me. I again informed her of her *Miranda* rights. She requested to waive those rights, and speak with me freely.

R. III at 115–16.

As this shows, the testimony about Mayfield's *Miranda* rights consisted of brief, unsolicited comments. Prosecutors moved on quickly. And

other than a short mention of the *Miranda* invocation by Mayfield's own attorney, the topic did not come up again during the trial, not even in prosecutors' closing arguments. Significantly, the testifying officer also revealed that Mayfield agreed to speak with him almost immediately after she initially invoked her rights. The fact that jurors heard about how Mayfield spoke with the officer makes it unlikely for them to infer from Mayfield's invocation of rights that she had something to hide or had otherwise done anything wrong.

All in all, Mayfield has not shown how the challenged testimony reasonably could have affected the outcome of her trial. As a result, she has not established reversible error.

AFFIRMED.

Entered for the Court


Richard E.N. Federico
Circuit Judge